## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHOWNS GROUP, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN C. GRIMBERG CO., INC., | : | |
| STEVEN J. GRIMBERG, HENRY | : | |
| DANFORTH, JAMES L. GRAHAM, | : | NO. 22-2238 |
| and JERRY ELMORE | | |

## <u>MEMORANDUM OPINION</u>

Savage, J.                                                                          January 30, 2024

Seeking to transform a construction contract dispute into a False Claims Act action, The Chowns Group, LLC ("Chowns"), a subcontractor on a government project, brings this *qui tam* action against the general contractor. It accuses John C. Grimberg Co., Inc. ("Grimberg"),[1] the general contractor, of submitting false claims to the government for payment for defective work that was not in compliance with the contract specifications and industry standards. It asserts that Grimberg terminated the subcontract in retaliation for complaining about the construction defects to the government. Chowns includes state law claims for wrongful termination, commercial defamation, breach of contract, fraud, and fraudulent inducement.

Defendants move to dismiss all counts,[2] except Count IV, commercial defamation. They argue that Chowns has failed to state a claim under the False Claims Act upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and has failed

---

[1] Chowns also names as defendants Steven J. Grimberg, President and Owner of Grimberg; Henry Danforth, Grimberg's General Counsel; James L. Graham, Senior Vice President of Grimberg; and Jerry Elmore, Grimberg's project manager.

[2] The government declined to intervene on January 23, 2023. The United States' Notice of Election to Decline Intervention, ECF No. 9.

to plead fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b). Defendants also argue that Chowns has no standing to assert a retaliation cause of action under 31 U.S.C. § 3730(h) because the statute protects only individual employees, contractors, or agents.  Even if it had standing, the defendants contend, Chowns did not engage in protective conduct.  Grimberg moves to compel arbitration of the state law claims as mandated by the contract.

We conclude that Chowns' allegations show that the defendants' certifications in the bills submitted to the government that the work satisfied contract specifications were not material to the government's decision to pay.  The retaliation claim fails because Chowns lacks standing to assert an FCA retaliation claim; and even if it had standing, its complaints of construction defects did not constitute protected conduct.  Consequently, Chowns has failed to state an FCA violation.  The state law claims, except defamation, are subject to arbitration pursuant to the contract.  Therefore, we shall dismiss the FCA claims, decline to exercise supplemental jurisdiction over the state law defamation claim, and compel arbitration of the remaining state law claims.

### Background[3]

The United States contracted with Grimberg to build a new school building on the Marine Corps Base in Quantico, Virginia ("Quantico Project").[4]  The project was overseen and funded by Naval Facilities Systems Engineering Command.[5]  In response to a

---

[3] The facts are recited from the allegations in the First Amended Complaint. We accept them as true and draw all reasonable inferences from them in favor of Chowns.

[4] First Am. Compl. ¶¶ 2, 27, ECF No. 25 ["Compl."].  We refer to Grimberg's contract with the government as the Prime Contract.

[5] *Id.* ¶ 4.

request for bids,[6] Chowns submitted a bid for steel work.[7]  On January 12, 2018, it entered into a subcontract with Grimberg to provide labor and materials for the structural steel work.[8]  The subcontract called for completion of construction by January 11, 2020.[9] Chowns began supplying steel to Grimberg in September 2019.[10]

Construction on the Quantico Project was delayed throughout 2019 due to soil conditions and leaking underground fuel storage tanks.[11]  Chowns attributes additional delays to "Grimberg Co.'s poor supervision of the work of other subcontractors."[12]  During this period, Chowns delivered multiple loads of steel.[13]  Some were turned away, forcing Chowns to pay for storage for the unloaded steel.[14]  Others remained on trailers for twelve months due to delays and issues with the foundation walls upon which the steel was to be erected.[15]

Sometime before April 2020, Chowns alerted Grimberg to construction defects, including deficiencies in the concrete, foundations, and the Insulated Concrete Form (ICF) wall system.[16]  Chowns informed the on-site government representative of the defects, identifying incorrect elevations and missing pockets and bearing plates.[17]

---

[6] *Id.* ¶ 43.

[7] *Id.* ¶ 44.

[8] *Id.* ¶¶ 20, 24, 26.

[9] *Id.* ¶ 36.

[10] *Id.* ¶ 25.

[11] *Id.* ¶¶ 31-32.

[12] *Id.* ¶ 38, n.1.

[13] *Id.* ¶ 33.

[14] *Id.* ¶ 34.

[15] *Id.* ¶ 33.

[16] *Id.* ¶¶ 41, 50.

[17] *Id.* ¶ 53.

James Graham, Senior Vice President, contacted Chowns and threatened to bar anyone talking to the government from the job.[18]  Chowns discussed the construction concerns with Steven Grimberg, President and Owner of Grimberg Co., and Henry Danforth, Grimberg's General Counsel.[19]

Grimberg directed Chowns to fix the elevation errors, missing bearing plates and embeds, and mislocated pockets in the ICF walls needed to connect to or support the steel.[20]  Jerry Elmore, Grimberg's project manager, instructed Chowns to use shims to fill in gaps that exceeded four inches.[21]  Grimberg issued a change order authorizing the purchase of a pallet of shims to use in correcting the defects.[22]

Grimberg also complained to the bar joist supplier, insisting that the bar joists were not fabricated properly.[23]  Grimberg later learned that the joists were built to specification and the problem was that the wall was not constructed at the proper elevation.[24]  Danforth "began a rushed campaign to get the out-of-specification work completed and thereby covered up."[25]  Grimberg demanded additional crews working overtime to fix the errors.[26]

To make up for delays, Grimberg continued construction during the COVID-19 lockdown from mid-March through April 2020.[27]  It directed Chowns to fabricate and

---

[18] *Id.*

[19] *Id.* ¶ 55.

[20] *Id.* ¶ 51.

[21] *Id.* ¶ 54.

[22] *Id.*

[23] *Id.* ¶ 57.

[24] *Id.*

[25] *Id.* ¶ 58.

[26] *Id.* ¶ 59.

[27] *Id.* ¶ 38.

deliver steel.[28]  Chowns could not force its employees to work at its Pennsylvania location or go to the Quantico Project without violating the Governor of Pennsylvania's order requiring non-essential businesses, including construction, to cease operations.[29]

On April 28, 2020, Grimberg terminated the subcontract with Chowns.[30]  Chowns asserts that Grimberg terminated the subcontract because Chowns had complained to Grimberg about the workmanship defects and planned to relay information to the government.[31]

On June 3, 2020, Chowns' attorney sent a letter containing a "Statement of Construction Defects" to Soledad P. Credo, Contracting Officer and Supervisory Contract Specialist.[32]  The letter asserted that Grimberg did not perform the work in accordance with the plans and specifications, and in a good and workmanlike manner.[33]  It detailed defects that it warned could result in catastrophic collapse, causing injury to property and persons.[34]

The Navy investigated the Quantico Project and discovered that vertical rebars had been installed inside the horizontal rebars, causing the vertical rebars to drift inward toward the middle of the ICF walls during the concrete pours of the ICF walls.[35]  As a result, the ICF wall system was structurally deficient.[36]

---

[28] *Id.*

[29] *Id.* ¶¶ 38-39.

[30] *Id.* ¶¶ 40, 104.

[31] *Id.* ¶ 105.

[32] *Id.* ¶ 63.

[33] *Id.* ¶ 64.

[34] *Id.*

[35] *Id.* ¶ 68.

[36] *Id.* ¶ 69.

On July 28, 2021, and again on August 19, 2021, the Navy ordered Grimberg to demolish and reconstruct the ICF walls because they did not meet the standards in the contract drawings and specifications.[37]   In mid-November 2021, Grimberg started to demolish the ICF walls.[38]  The contract completion date was extended.[39]

Grimberg submitted monthly claims for payment to the federal government for completed work.[40]  In each claim, it certified that it had performed the work in compliance with the contract plans and specifications, and in a good and workmanlike manner.[41]  Chowns alleges that Grimberg's work did not comply with AISC (American Institute of Steel Construction) requirements, industry standards it alleges the Prime Contract required.[42]   It contends that because Grimberg knew of the construction defects, its certification that the work had been performed in accordance with the plans and specifications was fraudulent.[43]   Consequently, so Chowns alleges, the claims for payment were false.[44]

---

[37] *Id.* ¶¶ 70-71. At oral argument, defense counsel represented that on July 28, 2021, the Navy directed Grimberg to demolish the ICF walls.  After a further conversation about alternative solutions, on August 19, 2021, the Navy again directed Grimberg to demolish the ICF walls. Oral Argument Tr., ["Tr."] Dec. 12, 2023, 26:9-14.

[38] Compl. ¶ 72.

[39] Tr. 16:10-11.

[40] Compl. ¶ 73. The complaint alleges that the payments began in mid-2017 but does not explain why Grimberg was getting paid in 2017 when it did not sign the Prime Contract or begin work until 2018.

[41] *Id.* ¶ 74.

[42] *Id.* ¶ 99.  Chowns alleges that Grimberg failed to meet three AISC requirements: (1) Section 16.1-488-90, which requires quality control and inspection for buildings; (2) Section 16.3-17-57, which requires certain procedures regarding revisions to the work and correction of errors; and (3) AISC procedures that require processes including approvals before any work may proceed to ensure the steel meets job specifications.  *Id.* ¶¶ 46-48.

[43] *Id.* ¶ 76.

[44] *Id.* ¶ 99.

Moving to dismiss the First Amended Complaint, Grimberg contends that Chowns has failed to allege facts showing that it has a plausible substantive or retaliation claim under the FCA.  In deciding the motion, we apply the following standards.

### Standard of Review

To survive a Rule 12(b)(6) motion, a complaint must set forth enough factual allegations to "state a claim to relief that is plausible on its face."  *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A conclusory recitation of the elements of a cause of action is not sufficient. *Oakwood Lab'ys LLC v. Thanoo,* 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted).  The plaintiff must allege facts necessary to make out each element.  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  In other words, the complaint must contain facts which support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim.  Then, disregarding legal conclusions, we determine whether the alleged facts make out a plausible claim for relief.  *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022) (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009)).  In doing so, we accept all well-pleaded allegations in the complaint as true and interpret them in the light most favorable to the plaintiff, drawing

all inferences in the plaintiff's favor. *Id.* (citing *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787, 790 (3d Cir. 2016); *Iqbal*, 556 U.S. at 679; *Fowler*, 578 F.3d at 210-11).

## Analysis

### Substantive False Claims

Chowns asserts claims under three provisions of the FCA: 31 U.S.C. § 3729(a)(1)(A), knowingly presenting a false or fraudulent claim for payment or approval to the government; 31 U.S.C. § 3729(a)(1)(B), knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the government; and 31 U.S.C. § 3729(a)(1)(C), conspiring to commit an FCA violation.

To state causes of action under § 3729(a)(1)(A) and (B), the relator must allege facts showing: (1) the defendant presented a false claim for payment to the government; (2) the defendant knew the claim was false; (3) the false claim or the false statement in support of the claim was material to the government's decision to pay the claim; and (4) the false claim or false statement caused the government to make payment. *United States and State of New Jersey ex rel. Druding v. Care Alternatives*, 81 F.4th 361, 366 (3d Cir. 2023) ["Care Alternatives II"]; *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 487 (3d Cir. 2017). Thus, a substantive false claim cause of action "includes four elements: falsity, causation, knowledge, and materiality." *Petratos*, 855 F.3d at 487 (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, (2016)).

### *Falsity*

A legally false claim is one that falsely certifies that the claimant has complied with a statute, regulation, or contractual requirement. *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018) (citation omitted). A legally false

certification may be express or implied.  An express false certification occurs when a defendant makes a false affirmative statement that it has complied with a contract term, statute, or regulation.  *United States ex rel. Druding v. Care Alternatives*, 952 F.3d 89, 96 (3d Cir. 2020) ["Care Alternatives I"] (citing *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741 (10th Cir. 2018)).  An implied false certification occurs when a claimant fails to disclose that the goods or services provided do not comply with a statutory, regulatory, or contractual requirement.  *Escobar*, 579 U.S. at 190-91.  The requirement need not be a condition of payment.  *Id.* at 190.

A failure to comply with federal regulations incorporated into a construction contract may form the basis for an FCA claim.  *United States of America ex rel. Int'l Bhd. of Elec. Workers Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 344, 347-48 (3d Cir. 2021).  Industry standards that are incorporated into the contract can also form the basis for a false claim.  *Id.* at 342; *Escobar*, 579 U.S. at 195.  When the claimant certifies that it has complied with a contractual provision and omits additional information which would reveal that it did not, the claim is legally false.  *Escobar*, 579 U.S. at 190.  Chowns alleges that when Grimberg submitted its bills, it falsely certified that its work complied with AISC requirements specified in the Prime Contract.[45]

Chowns specifies that it is proceeding under an implied false certification theory.[46] It alleges that despite the defects in the construction, Grimberg "certified that it performed such work in accordance with the plans and specifications and in a good and workmanlike manner" and did not disclose its noncompliance with contractual requirements in its

---

[45] Compl. ¶ 99.

[46] Pl.'s Br. In Opp. To Defs.' Mot. to Dismiss Counts I, II, III, V, and VI of Pl.'s First Amended Compl., at 14, ECF No. 29.

claims for payment.[47]  Chowns has sufficiently alleged that Grimberg made a "specific representation" when it certified the work was in accordance with the contract specifications and was done in a good and workmanlike manner.  Chowns has pleaded that Grimberg did not disclose its noncompliance.[48]

Chowns has alleged facts that show the defendants submitted false claims. Grimberg submitted claims for payment certifying that the work complied with the contract specifications and had been performed in a good and workmanlike manner.[49]  As alleged, the work was not done in compliance with the contract specifications and Grimberg knew it.  Additionally, Chowns claims that Grimberg did not comply with AISC guidelines that were incorporated in the Prime Contract.[50]  Accepting these allegations as true, Chowns has properly pled that Grimberg submitted false claims to the government when it certified the work was done in accordance with the contract specifications.

*Presentment of Claims*

Chowns must allege that Grimberg presented a claim to the government for payment.  31 U.S.C. § 3729(a)(1)(A).  Grimberg argues Chowns does not identify the plans and specifications that defendants supposedly certified as having satisfied, whether there was an express or implied certification on the face of the invoice, or whether the government was actually invoiced for the work Chowns alleges was defective.

---

[47] Compl. ¶ 74.

[48] It is unclear from the complaint whether Grimberg's alleged certification was an explicit certification that the work complied with all contractual requirements.  It is reasonable to infer that Grimberg's certification "that it performed" the work in compliance with the contract was an express, affirmative statement.  Therefore, Chowns has also sufficiently pleaded express false certification.

[49] Compl. ¶ 88.

[50] *Id.* ¶¶ 64, 99.

Defendants also contend that the allegations about claims for payment are "conclusory" and lack the detail required under Fed. R. Civ. P. 9(b).

At this stage, even under the stringent Rule 9(b) requirements, Chowns is required to plead, not prove, its claim.  Chowns has alleged that Grimberg had a contract with the government, billed the government each month, and certified that the work complied with the contract requirements when it did not.  It is enough for Chowns to plead that Grimberg submitted monthly claims for payment and to show that the government did in fact pay the claims.  Chowns has adequately pleaded presentment of false claims.

*Knowledge*

A relator must plead facts showing that the defendants knew that the claims were false.  *Escobar*, 579 U.S. at 182. "Knowingly" is defined to "(A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(A)–(B).  A defendant acts knowingly when it runs "a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *United States ex rel. Streck v. Allergan, Inc.*, 894 F. Supp. 2d 584, 592 (E.D. Pa. 2012) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)).  A defendant's erroneous, but reasonable, interpretation of its legal obligations precludes liability.  *United States ex rel. Streck v. Allergan*, 746 F. App'x 101, 106 (3d Cir. 2018) (quoting *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015)).  In other words, the defendant must have known that the claims were false.

Chowns sufficiently alleges knowledge.  It alleges that it communicated its concerns to the defendants and informed the on-site government representative of the construction flaws.  Chowns had a meeting with Steven Grimberg and Henry Danforth discussing concerns about the project, specifically problems Chowns encountered in the work before installing steel.  Grimberg also directed Chowns to fix some of the flaws and issued change orders to remedy them.  The defects as alleged in the Amended Complaint were so obvious and severe that the defendants had to have known that they were not compliant with AISC standards and contract specifications.  Yet, they certified in the bills that they were.  In short, one can reasonably infer that the defendants knew that the work did not comply when they submitted claims for payment.

*Materiality*

Not every false statement provides a basis for an FCA cause of action.  Only misrepresentations which are material to the decision to pay the claim amount to a fraudulent claim.  *Escobar*, 579 U.S. at 187, 191-92.  A statement or omission is "material" if it "ha[s] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

Materiality depends on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Escobar*, 579 U.S. at 193.  In other words, the government must have relied upon the misrepresentation in deciding to pay the claim.  *Id.* at 190.  In determining materiality, we examine the totality of the circumstances to see if the false statement tends to or is capable of influencing the payment or receipt of money or property.  *Farfield Co.*, 5 F.4th at 342 (citing 31 U.S.C. § 3729(b)(4)).

Keeping in mind that the materiality standard is a demanding one, we examine whether the allegations, considered in their entirety, show that the defendants'

compliance with particular statutory, regulatory, or contractual requirements was material to the government's decision to pay the claim.  Relevant to the inquiry is whether the government paid the claims despite knowing of the noncompliance.  *Petratos*, 855 F.3d at 489 (citing *Escobar*, 579 U.S. at 194-96).

Materiality "turns on a variety of factors such as: (1) whether the government has expressly designated the legal requirement at issue as a 'condition of payment'; (2) whether the alleged violation is 'minor or insubstantial' or instead goes to the 'essence of the bargain' between the contractor and the government; and (3) whether the government made continued payments … despite 'actual knowledge' of the violation."  *Care Alternatives II*, 81 F.4th at 367 (citing *Escobar*, 579 U.S. at 193 n.5, 194-95 (internal quotation and citations omitted)).

Chowns alleges Grimberg was required to comply with AISC standards in order to bill for the work.  The "mere fact" that a provision is "identified as a condition of payment does not, in and of itself, support a finding of materiality."  *Care Alternatives II*, 81 F. 4th at 370 (citing *Escobar*, 579 U.S. at 194).  It is relevant only so far as the designation "signals" the importance the government places on that provision.  *Id.* (citing *Escobar*, 579 U.S. at 191).  Where a contractor fails to disclose noncompliance with a condition of payment, it does not commit a material violation if the government routinely pays such claims.  *Id.* (citing *Escobar*, 579 U.S. at 195).  Therefore, the "mere fact" that Chowns alleges the AISC standards and contract specifications were conditions of payment is not dispositive.

A violation of a statute, regulation or contractual requirement is not necessarily material when the government pays a claim with full knowledge of the violation.  *Petratos*,

855 F. 3d at 489 (citing *Escobar*, 579 U.S. at 194-95).   Payment under those circumstances "is very strong evidence that those requirements are not material." *Escobar*, 79 U.S. at 195.   Statements are not material to a decision to pay when the government knows about deficiencies and continues to pay defendants despite those deficiencies.   *See id.*   Therefore, if the failure to disclose noncompliance with a contractual requirement would not have impacted the government's decision to pay, the omission is not material.

Chowns contends that the failure to disclose defects in the concrete walls was material because the defects created a catastrophic safety hazard.   The defects were so severe that the government ordered demolition and reconstruction.

The materiality inquiry turns not on the magnitude of the defect, but on the effect the misstatement or omission had on the government's decision to pay.   That the defect was material to the value of the product or service provided does not necessarily make the misrepresentation that the work conformed to the contract specifications material.   Here, the government continued to make payments even after it was aware of the defects, which were obviously noncompliant.   The government did not withhold payment but required Grimberg to reconstruct the building.[51]

The defects were known to the government.   A government representative was on site on a regular basis.   The representative engaged in quality assurance and met regularly with Grimberg.[52]   Periodic inspections of the work were conducted by an

---

[51] Compl. ¶ 73.

[52] Tr. 14:15-15:3.

independent third party.[53]  Yet, despite knowing of the defects, the government continued to make payments.

The Court in *Escobar* also considered whether the alleged violation was "minor or insubstantial."  *Escobar*, 579 U.S. at 194.  As the allegations show, Grimberg's representations in its claims for payment did not cause or could not have caused financial loss to the government. "[T]he submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act."  *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 184 (3d Cir. 2001) (internal citation omitted).  In other words, only false claims that cause or could cause financial loss to the government are actionable under the FCA.

The government continued to make progress payments to Grimberg when it knew the work was defective because it could withhold final payments until Grimberg remediated the work at its expense.  Indeed, it ordered Grimberg to demolish the structure and reconstruct it to contract specifications.[54]

Considering the totality of the circumstances, we conclude that the failure to disclose that the foundation walls did not comply with AISC standards was not material.  *See Petratos*, 855 F.3d at 489.  There was no actual loss.[55]  That the government continued to make payments after it knew of the noncompliant work demonstrates that the violation

---

[53] *Id.* 15:6-18.

[54] At oral argument, Grimberg represented that the government chose not to invoke the liquidated damages clause contained in the Prime Contract.  Instead, the government extended the contract. Significantly, Grimberg was not paid for the time or work it took to demolish the defective construction. *Id.* 15:24-16:25.

[55] Actual damages are not a necessary element of a False Claims Act claim.  Rex Trailer Co. v. United States, 350 U.S. 148, 152-53 (1956); *United States v. Miller,* 645 F.2d 473 (5th Cir.1981); *Hutchins*, 253 F.3d at 184.  There may be FCA liability even where the government suffered no injury. *See United States ex rel. Sanders v. American–Amicable Life Ins. Co.,* 545 F.3d 256, 259 (3d Cir.2008).

was immaterial.  Because the alleged facts show that the false statements in the invoices were not material, Chowns has not stated a substantive cause of action under the FCA.

### Conspiracy

To state a claim under 31 U.S.C. § 3729(a)(1)(C) for conspiracy, Chowns must allege both an agreement among conspirators to commit fraud and an act in furtherance of the agreement.  *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007).  It must plead an underlying violation of the FCA. *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (3d Cir. 2017) (citing *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)).

Because Chowns fails to make out a claim that the defendants submitted false or fraudulent claims for payment to the government, it has failed to plead an underlying violation of the FCA. Without one, there can be no conspiracy to violate the FCA under § 3729(a)(1)(C).

### 31 U.S.C. § 3730(h) – Retaliation

Section 3730(h)(1) of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Defendants contend that Chowns lacks standing to bring a retaliation claim because § 3730(h)(1) only protects individuals, not corporate entities. They emphasize that Grimberg was not Chowns' employer.[56]

No circuit court has ruled that corporate entities have standing to bring a retaliation claim under § 3730(h).  Nor has any district court in the Third Circuit addressed the issue.  Originally, § 3730(h) only referenced "employees" when discussing who could sue for retaliation.  Congress amended the section in 2009 to include "contractor[s]" and "agent[s]."  This amendment has been the source of disagreement among district courts.  Some have held that it was intended to include corporate entities, and others have concluded it protects only individuals.

In *United States ex rel. Fryberger v. Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 812 (N.D. Cal. 2014), the court found that the term "contractor" in § 3730(h) applied only to individuals because the forms of relief enumerated in the statute were applicable only to individual plaintiffs.  The court reasoned that the statute only applied to individuals because only individuals stood to benefit from the statutory remedies.  *Id.*  Those remedies are "reinstatement with the same seniority status," "2 times the amount of back pay," "interest on the back pay," and "special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  *Id.* (citing § 3730(h)(2)).  Looking to legislative history, it concluded that Congress enacted the 2009 amendment to extend protection to individuals who were not traditionally considered

---

[56] Defs.' Br. in Supp. of Mot. to Dismiss Counts I, II, III, V and VI of Pl.'s Am. Compl. 16, ECF No. 26-3.  Plaintiff does not address Grimberg's assertion that it was not an employer or its claim that the contract termination was not an adverse employment action.

employees, not to expand protection to entities.  *Id.*  (citing H.R. Rep. 111-97 (2009); S. Rep. No. 110-507 (2008)).

In *Munson Hardisty, LLC v. Legacy Pointe Apartments., LLC*, 359 F. Supp. 3d 546, 558 (E.D. Tenn. 2019), the district court went the other way.  The court did not consider legislative history because it concluded the plain language alone supported its holding. *Id.* at 558-59.  It found that the plain meaning of the word "contractor" in the statute "makes clear" that § 3730(h) includes individuals and entities.  *Id.* at 558.

Similarly, in *Simon v. Healthsouth of Sarasota Ltd. P'ship*, 2019 WL 11505269, at *6 (M.D. Fla. Dec. 16, 2019), the district court did not look to the legislative history.  It held that the plain language of the statute showed that it covered a corporate entity.  *Id.*  The court explained, "Congress easily could have written [the statute] to cover only individuals."  *Simon*, at *5.  Further, it stated that although the enumerated forms of relief in § 3730(h) do apply to individuals, the statute also authorizes "all relief necessary."  *Id.* (citing 31 U.S.C. § 3730(h)(1)).  The court reasoned that this general provision could include relief that is applicable to entities.

We conclude that the plain language of the statute and the legislative history reveal that Congress intended § 3730(h) to cover only individuals.  The statute itself uses terms that apply to individuals when it states any "employee, contractor, or agent" may bring a claim.  37 U.S.C. § 3730(h)(1).  The legislative history reveals that Congress enacted the 2009 amendments to provide greater protection for individual plaintiffs and not to provide protection for entities.  Congress expressed its intent clearly.  "Subsection 3(e) would broaden protections for whistleblowers by expanding the False Claims Act's anti-retaliation provision to cover any retaliation against those who planned to file an action

(but did not), people related to or associated with relators, and contract workers and others who are not technically 'employees.'" H.R. Rep. No. 111-97, at 7, 14 (2009). "[T]he substitute bill included a clarifying provision to include the term 'agent' in the list of individuals who may use the anti-retaliation provisions of the FCA." S. Rep. No. 110-507, at 14 (2008). Each remedy that Congress enumerated is a remedy that applies only to individuals. *See* 31 U.S.C. § 3730(h)(2). Therefore, consistent with the legislative history, we hold that a corporate entity does not have standing to bring a claim for retaliation under § 3730(h).

Even if it had standing, Chowns has not stated a retaliation claim. It has not alleged facts showing that it engaged in protected conduct. It did not complain to Grimberg about fraudulent conduct or false claims. It complained about construction defects and poor workmanship.

To establish that it was retaliated against because of conduct done in furtherance of an FCA claim, Chowns must show that: (1) it engaged in protected conduct; (2) Grimberg knew it engaged in the protected conduct; (3) Grimberg retaliated against Chowns by taking adverse action; and (4) its retaliation was motivated, at least in part, by Chowns engaging in that protected conduct. *Hutchins*, 253 F.3d at 186 (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)); 31 U.S.C. § 3720(h)(1).

"'[T]he whistleblower protections apply only to actions taken in furtherance of a *viable* False Claims Act case,' though it need not be a 'winning FCA case.'" *Petras*, 857 F.3d at 508 (internal citation omitted). If a plaintiff's conduct could not "reasonably

lead to a viable FCA action, then the whistleblower provision provides him no protection." *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002).

Chowns did not complain of fraud or false claims.  It complained of construction defects and poor workmanship.  It submitted a letter to the government detailing the defects.  The letter could not have instigated Grimberg's terminating the contract. Chowns had been ordered off the job weeks before the letter was sent.  The only other action Chowns ever took was speaking to the on-site government representative and complaining to defendants about construction defects.  At no time, did Chowns accuse Grimberg of submitting false claims.

Chowns did not threaten to make a formal report to the government or bring an FCA claim.  Chowns, in the letter, explained that it "had a duty [as an AISC certified steel fabricator] to inform the owner and the design professional of the defects and the issues presented."[57]  Chowns never complained to the government that Grimberg was submitting false claims.  In sum, Chowns has not pleaded facts to support a finding that it engaged in protected conduct, an essential element of an FCA retaliation cause of action.

### State Law Claims

Grimberg has demanded arbitration of the state law claims, except the commercial defamation claim, pursuant to the arbitration provision in the contract.  Hence, we shall address Grimberg's motion to compel arbitration embedded in its motion to dismiss.[58]

Under the Federal Arbitration Act, "[a] party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as

---

[57] Compl. ¶ 64.

[58] In its motion, Grimberg seeks dismissal of the state law claims because they are subject to arbitration.  It does not expressly request we compel arbitration.

an order compelling such arbitration." *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003) (citing 9 U.S.C. §§ 3-4) (additional citations omitted).   Where the plaintiff fails to "respond[ ] to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," the motion is considered under a Rule 12(b)(6) standard.   *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (internal citation omitted).

In evaluating the arbitrability of a dispute, a court must determine whether a valid agreement to arbitrate exists and, if so, whether the dispute falls within the scope of the agreement.   *Kirleis v. Dickie, McCamey & Chilcote, PC*, 560 F.3d 156, 160 (3d Cir. 2009) (citing *Quiles v. Fin. Exch. Co.*, 2005 PA Super 250, 879 A.2d 281, 283 n.3 (Pa. Super. Ct. 2005)) (additional citations omitted).

Chowns does not challenge the validity of the arbitration provision. Nor does it question that the state law claims are within the scope of the agreement.  It contends only that Grimberg did not file a timely demand for arbitration.

The arbitration provision provides that defendants can demand arbitration "at any time before the last day to file an Answer or other responsive pleading to the … Complaint."[59] Defendants were served the Summons and the Complaint on February 13, 2023.[60]   With Chowns' consent, the defendants were granted an extension to file a response to April 14, 2023.[61]   At oral argument, Grimberg represented that it filed a

---

[59] Subcontract 879-7-0505 § 15 (attached to Defs.' Mot. to Dismiss Counts I, II, III, V, and VI of Pl.'s Am. Compl., ECF No. 26 as Ex. A, ECF No. 26-1) ["Subcontract"].

[60] Defs.' Consent Mot. for Extension of Time to File Responsive Pleadings ¶ 2, ECF No. 15 ["Consent Mot."].

[61] Consent Mot. ¶ 3.  The order stated the defendants shall respond to the Complaint no later than April 14, 2023.  Order (March 2, 2023), ECF No. 16.

demand for arbitration with the American Arbitration Association on April 13, 2023, the day before it moved to dismiss the Complaint.[62]  After Chowns amended its complaint, defendants again moved to dismiss the Amended Complaint on May 26, 2023.[63]

Chowns claims that it did not agree to an extension of the time to demand arbitration in the consent motion.  There is no specific reference to arbitration in the extension motion

When the consent motion was granted and the deadline extended, the last day to file an answer became April 14, 2023.  When litigation is commenced, the Standard Subcontract Terms and Conditions that are part of the subcontract expressly limits the time to demand arbitration as "any time before the last day to file an answer or other responsive pleading."[64]  Grimberg filed its demand for arbitration on April 13, 2023, before the last day to file an answer or responsive pleading.  Therefore, because the defendants' demand for arbitration was timely and the state law claims, except the commercial defamation claim, are subject to arbitration, we shall compel arbitration.

"Where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original) (citing *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); 28 U.S.C. § 1367(c)(3).

---

[62] Tr 39:23-40:1; 42:11-12; Defs.' Mot. to Dismiss, ECF No. 17.  Chowns confirmed the demand when it argued it was late.

[63] Defs.' Mot. to Dismiss, ECF No. 26.

[64] Subcontract, ¶ 15.

Having dismissed the federal claims and compelling arbitration on the other state claims, we decline to exercise supplemental jurisdiction over the state law defamation claim.  We shall dismiss the defamation cause of action without prejudice.

Where the complaint does not withstand a 12(b)(6) motion, a curative amendment must be allowed unless amendment would be inequitable or futile.  *Alston v. Parker*, 363 F.3d 229, 235 (3d. Cir. 2004).  An amendment is futile if the proposed amendment would still fail to state a claim upon which relief can be granted.  *Shane v. Fauver*, 213 F.3d 113,115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).  Chowns will not be given leave to amend its amended complaint because amendment would be futile.

## Conclusion

Because it has not alleged facts that would, if proven, establish that defendants made materially false statements to the government, Chowns has failed to state a substantive FCA claim.  Lacking standing and having failed to allege facts showing that it engaged in protected conduct, Chowns has not stated a claim for retaliation under the FCA.  Having dismissed the federal claims, we decline to exercise supplemental jurisdiction over the state law defamation claim and compel arbitration of the remaining state law claims.